UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE LAPORTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12 C 9543 |
| v. | ) | |
| | ) | Judge George M. Marovich |
| BUREAU VERITAS | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

After his employment was terminated, plaintiff George LaPorte ("LaPorte") filed a four-count complaint against defendant Bureau Veritas North America, Inc. ("Bureau Veritas"). In Counts I and II, respectively, LaPorte claims that defendant failed to provide a reasonable accommodation and discharged him due to his disability, both in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. In Count III, LaPorte claims that defendant violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., by discharging him in retaliation for his having taken a leave under the FMLA. Finally, in Count IV, LaPorte alleges that defendant discharged him due to his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

Defendant has filed a motion for summary judgment on each of plaintiff's claims. Plaintiff has filed a motion for partial summary judgment with respect to Counts I and III. For the reasons set forth below, the Court grants defendant's motion for summary judgment. The Court denies plaintiff's motion for summary judgment.

# I.    <u>Background</u>

The following facts are undisputed unless otherwise noted.[1]

Plaintiff LaPorte is an ergonomist, which is to say his specialty is posture and the analysis of workplace body stressors.  LaPorte started working for defendant Bureau Veritas in 2005,

---

[1]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment.  This Court enforces Local Rule 56.1 strictly.  Facts that are argued but do not conform with the rule are not considered by the Court.  For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed.  Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.  *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004).  It is not enough at the summary judgment stage for either party to *say* a fact is disputed.  The Court considers a fact disputed *only* if both parties put forth admissible evidence of her or its version of the fact.  Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.  The Court enforces Local Rule 56.1 with respect to both parties regardless of whether either party moves to strike non-complying portions, because the purpose of the rule is to make *the Court's* job manageable, not to give litigants additional ammunition to use against one another.

On a number of occasions in response to defendant's statement of facts, plaintiff objected on the grounds that an asserted fact was supported by company documents, instead of by "pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any."  In support of these objections, plaintiff cited a former version of Fed.R.Civ.P. 56(c), which did not list "documents" as appropriate support for facts at the summary judgment stage.  The version plaintiff cited has been replaced by Fed.R.Civ.P.56(c)(A), which says that facts must be supported by "citing to particular parts of materials in the record, including depositions, *documents*, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(A) (emphasis added).  Accordingly, the Court overrules plaintiff's objections to defendant's use of documents to support its facts.  Of course, hearsay is a separate problem, and, on some occasions, plaintiff has objected to the use of particular documents on hearsay grounds.  Where the hearsay objection was to a statement made by plaintiff himself, the objections are overruled.  Fed.R.Evid. 801(d)(2).  Where plaintiff has objected on the grounds of hearsay to defendant's use of one of its own company documents that was not established to be a business record via affidavit or deposition testimony, the objections are sustained.

when Bureau Veritas purchased the company for whom LaPorte worked. At the time, LaPorte was about 49 years of age (he was born in 1956). Bureau Veritas provides safety consulting, testing and certification services for its various clients. Among Bureau Veritas's services is ergonomics consulting, LaPorte's specialty.

At Bureau Veritas, LaPorte was a valued employee. During his time there, LaPorte was promoted to Ergonomics Manager and then to Senior Project Manager Ergonomics.

LaPorte's duties as an ergonomist included traveling to clients' worksites, performing evaluations of clients' physical equipment, evaluating the interactions of the clients' employees with that equipment, and developing plans to reduce stress caused by repetitive motions. To perform this "field work," LaPorte used various ergonomics tools. Among them were a two-pound camcorder, a four-pound grip-strength tester and a four-pound Force Meter. Together, LaPorte's ergonomic tools weighed less than 25 pounds. LaPorte transported his tools in a wheeled bag. In addition to field work, LaPorte was also responsible for drafting reports and assessments related to his field work and for reviewing reports and billing by ergonomic subcontractors. As a Senior Project Manager, LaPorte performed more office work than he had when he first began his career.

LaPorte reported to the Chicago office in Bureau Veritas's Midwest Region (one of its five regions in the United States). He was the only ergonomist in the Midwest Region, though, at the time, Bureau Veritas employed five full-time ergonomists in the entire United States. LaPorte reported to Regional Manager Jeff McCombs ("McCombs"). McCombs, in turn, reported to Russ Chadwick ("Chadwick"), the Director of the Chicago Regional Office. Chadwick, in turn, reported to Jeff Milosch ("Milosch"), the Vice President of the Midwest Region. Each of these men is over the age of fifty.

The fact that LaPorte reported to the Chicago office did not mean that all of LaPorte's field work was in defendant's Midwest Region. Although Bureau Veritas had a policy of assigning the nearest ergonomist to a project, Bureau Veritas might send a more distant ergonomist under certain circumstances. For example, if the nearest ergonomist had a full calendar (the ergonomists could see each other's calendars electronically) and Bureau Veritas could not reschedule the work, Bureau Veritas might send a different ergonomist. Still, Bureau Veritas recorded revenues for an ergonomist's work to the region at which he was based, not to the region where the project was located. LaPorte traveled extensively for his job. In 2010, LaPorte traveled to Florida, Canada, New York, Pennsylvania, Texas and Iowa. Most of LaPorte's work was performed outside of the office. LaPorte visited the Chicago office only about three times per year.

Bureau Veritas categorized its clients as either regional (those who contracted for a project in one location or region) or national (those who contracted for ergonomics work throughout the nation). In 2010, LaPorte worked on several national accounts, including Cardinal Health, Carefusion, Baxter, Boeing, Schwab and Harris Bank. For Harris Bank and Schwab, LaPorte was responsible for reviewing the account billing, because, for those clients, Bureau Veritas used contractors to perform the field work. LaPorte also reviewed the ergonomics reports written by the contractors.

The events which led to this lawsuit began in October 2010, when LaPorte requested permission from McCombs (his immediate supervisor) to work remotely from Buffalo, New York. The reason LaPorte wished to work remotely from Buffalo was his father's poor health, and Bureau Veritas granted the request. LaPorte told McCombs that he wished to remain as "billable" as possible while working from New York. For several months, LaPorte worked from New York.

Soon, LaPorte needed time off for his own health problem. In December 2010, while exiting a hot tub in his hotel, LaPorte slipped and injured his rotator cuff. LaPorte selected Dr. Marc Fineberg ("Dr. Fineberg") as his physician to oversee his medical treatment (which involved surgery) and recovery. As a result of the injury, LaPorte was unable to work. By December 20, 2010, LaPorte had informed McCombs that he would need a leave of absence. On December 23, 2010, Bureau Veritas received by facsimile a copy of LaPorte's "Certification of Health Care Provider," which Dr. Fineberg had filled out and which notified Bureau Veritas that, as of December 13, 2010, LaPorte had become fully disabled and, thus, unavailable for work.

On December 27, 2010, Bureau Veritas informed LaPorte that his twelve weeks of protected leave under the Family and Medical Leave Act started on (Monday) December 13, 2010. Because LaPorte was considered totally temporarily disabled, he received income-replacement benefits from an insurance policy paid for by Bureau Veritas.

LaPorte was in contact with Bureau Veritas during his FMLA leave. For example, on February 4, 2011, LaPorte sent an email to McCombs, in which email LaPorte stated that he was scheduled to speak at a conference on March 2, that he would probably not be back to work by then and that Bureau Veritas should probably find a replacement. By February 22, 2011, McCombs informed LaPorte that he had found someone else to present and asked LaPorte to send him "the material you were going to present." On February 10, 2011, LaPorte forwarded to Milosch an email he received from a client about scheduling work. On February 15, 2011, McCombs told LaPorte by email, "We will be glad when you are back."

LaPorte's twelve weeks of FMLA leave ended Sunday, March 6, 2010, but he was not able to return to work on March 7, 2010. Bureau Veritas did not terminate LaPorte's employment at that time. LaPorte asked for additional time off to heal, and Bureau Veritas granted the request.

On March 10, 2011, LaPorte wrote McCombs an email.  In the email, LaPorte wrote:

> Jeff, per our discussion today, my surgeon will probable [sic] allow me to return to work the end of March, however I would be restricted to OFFICE TYPE WORK ONLY (computer, phone, report review, etc.), NO FIELD WORK which requires traveling, lifting, pushing, pulling, etc.  I do not know when he will release me to conduct field work, but would think he would by the beginning or middle of May.

> Please let me know if BV can accommodate these restrictions, or if I need to wait until he releases me to conduct field work.

Also on March 10, LaPorte informed McCombs by email that he did not think he would be able to return in time to speak at a conference on March 31, 2011.  McCombs asked LaPorte to inform the conference that he would need to be replaced.

The end of March arrived, and LaPorte was still unable to return to work.  On March 21, 2011, Dr. Fineberg sent to Bureau Veritas by facsimile an update on LaPorte's condition.  Dr. Fineberg did not release LaPorte to perform office or field work.  Dr. Fineberg stated, "He will continue physical therapy emphasizing rotator cuff strengthening and range of motion and return for followup to check his progress in approximately 1 month.  Consider light duty at that time."  Dr. Fineberg's assessment was an accurate depiction of LaPorte's medical status.  On March 22, 2011, LaPorte sent McCombs an email, in which he stated:

> I had a follow-up visit with my surgeon yesterday.  Unfortunately, he did not release me to return to work with restrictions.  I had his office fax the visit results to Kim Pelt (per her request).

> He is happy with my progress to date, but doesn't want me to work 8 hours a day, even office type work only (computer, phone, report review, etc.) at this point.  He felt that by the end of April he would release me to conduct office type work only.  We will have to determine what would be available for me to do when we get to that point, or if I will need to wait until he releases me to conduct field work.

> As far as conducting field work which requires traveling, lifting, pushing, pulling, etc., he estimates that he would not release me to conduct that type of work until the end of June, at the earliest with some restrictions.  I had hoped that he would

release me sooner, but he stated that would be highly unlikely, but we will see how things go over the next couple of months.

        \*    \*    \*

I'm looking forward to coming back to work as soon as possible.

Please give me a call so we can discuss and let me know if you have any questions.

McCombs informed Robert Murphy, Bureau Veritas's Vice President of Technical Services and Quality, that LaPorte was not ready to return. Robert Murphy responded, "Hard to believe. I've seen people back to work faster after brain surgery."

LaPorte did some work during this time. On March 25, 2011, LaPorte sent an email to McCombs. In the email, LaPorte wrote, "Jeff, as we discussed some time ago, I will need to have you enter billable time under your name so we can bill Harris appropriately during my absence. Please make the following entries for Monday March 21st, so we can bill them next week." LaPorte listed three hours of work described as "emails/calls/work request development/report review."

Separately, but at around the same time, other regions within Bureau Veritas were hiring people to perform ergonomics work. In April 2011, Rhonda Mollura, who was 42 years old, started with Bureau Veritas in the position of Consultant in Santa Clara, California. In May 2011, Will Mann, who was 65 years old, started with Bureau Veritas in the position of Senior Consultant in Seattle, Washington.

Meanwhile, LaPorte's doctor continued to recommend that LaPorte not work. On April 25, 2011, LaPorte's doctor recommended that he remain off work for another month. On May 23, 2011, LaPorte was authorized to lift up to ten pounds, but his doctor recommended that he not return to work for another month. At about the same time, McCombs wrote in an email, "[Laporte is] apparently able to run errands, but can't make speaking engagements for BV."

By May 25, 2011, Bureau Veritas's Midwest Region "hit a slow spot in business." Bureau Veritas's accounts with Cardinal Health and Carefusion were substantially diminished, partly due to the economy and partly due to their decisions to use a different provider. McCombs and Chadwick spoke to Milosch (who managed, for a time, the Cardinal Health account) and concluded that not enough ergonomics work was available to justify LaPorte's salary. Milosch also spoke to other senior ergonomists to determine whether sufficient work existed. Chadwick (who made the decision to terminate LaPorte's employment) concluded that a few two-day projects could not justify LaPorte's position.

On May 26, 2011, Bureau Veritas's Chief Operating Officer ("COO") sent an email with a subject line of "Chicago Plan." In the email, the COO listed a number of employees whose employment would be terminated or whose employment would be considered for termination soon. For example, the email stated, among other things, "Terminate G. LaPorte at end of disability leave (105K annual)" and "Marolt, DeMarco and Tarranova to be monitored weekly. Good talents with good backlog for next couple of months, but expensive – take action if workload drops off again late summer."

Bureau Veritas eliminated a number of positions in the Chicago office at about the same time. For example, it eliminated the positions of: Office Manager (then held by Jennifer O'Callaghan, who was 30 years old); Consultant II (then held by Norman Bolivar, who was 46 years old); Senior Project Manager (then held by Martin Hamper, who was 57 years old); Consultant I (held by Scott Hoppel, who was 36 years old); Project Manager I (then held by Timothy Giles, who was 35 years old); and Project Manager II (then held by Ann Jurkowski, who was 47 years old). Only Jurkowski transferred to another position within Bureau Veritas. Specifically, Jurkowski, who had a law degree, applied for and was hired for a position in

litigation support in a different region. Outside of the Midwest Region, Milosch, McCombs and Chadwick lacked the authority to hire, fire or transfer employees.

On June 6, 2011, Cigna Group Insurance wrote to LaPorte to inform him that his income replacement benefits had been terminated, effective May 24, 2011.

Around the same time, Bureau Veritas hired another ergonomist. On June 9, 2011, ergonomist Steve Jones, who was 44 years of age, started with Bureau Veritas in the position of Senior Consultant in Seattle, Washington.

On June 20, 2011, LaPorte's doctor released him to return to work on June 27, 2011. The doctor restricted LaPorte to working no more than nine hours per day, to lifting no more than 25 pounds and to lifting no more than ten pounds over his head. LaPorte sent his doctor's written report to Bureau Veritas's benefits manager and asked the benefits manager to forward it to LaPorte's supervisor, McCombs. McCombs forwarded it to Milosch, who wrote to Kiran Wilson, "[w]e will need to term George LaPorte next week pending information on workload from Jeff McCombs." Soon thereafter, LaPorte learned his employment had been terminated. On or about June 23, 2011, LaPorte was told his employment was being terminated due to lack of work. The termination form stated, "George was released from disability with restrictions however there is no ergonomic work at the present time for him." LaPorte was surprised by his termination. He believed he had about six weeks of work to do for Aviall, Boeing and Grainger, three of Bureau Veritas's clients.

The week after LaPorte learned that his employment was being terminated, LaPorte telephoned Kiran Wilson ("Wilson"), the Human Resources Director. Wilson told LaPorte that Bureau Veritas had no open positions available. Wilson also told LaPorte that the company would reinstate him if a position were open.

Bureau Veritas set the effective date of his termination as July 1, 2011 so that LaPorte could receive health insurance benefits for the month of July. LaPorte advised the Illinois Department of Employment Security that his position had been eliminated, and he received unemployment benefits.

Not long after LaPorte's employment was terminated, one of Bureau Veritas's other ergonomists resigned. Specifically, on July 1, 2011, Daryl Griffiths, an ergonomist in Bureau Veritas's Pacific Northwest Region, resigned. This prompted two remaining Bureau Veritas ergonomists–Chris Shulenberger and Jeff Roholt–to write emails expressing their concern that Bureau Veritas may have difficulty serving its clients' need for ergonomists. The Chicago region did not replace LaPorte. The bill-reviewing work LaPorte had performed for the Chicago region was reassigned to two support staffers–Mary Starke (age 64) and Arlene Basten (age 60).

Other Bureau Veritas Regions, however, continued to hire ergonomists. In September 2011, Peregrin Spielholz ("Spielholz"), who was 42 years old, started with Bureau Veritas as a Senior Consultant in Seattle, Washington. In October 2011, Melanie Brown ("Brown"), who was 37 years old, started with Bureau Veritas as a temporary Consultant in Costa Mesa, California. The positions filled by Brown and Spielholz were advertised by Bureau Veritas on its website and on Monster.com. When Bureau Veritas advertises a position, it considers only those applicants who apply. LaPorte did not apply for the position filled by Spielholz or the position filled by Brown, though he knew that Bureau Veritas advertised open positions on its website.

Kiran Wilson ("Wilson") was Human Resources Director at Bureau Veritas during LaPorte's time there. Her practice, when an employee requested an accommodation, was to contact an employee's supervisor to determine whether work was available within the employee's restrictions. Wilson does not recall any efforts to provide an accommodation for LaPorte. None of LaPorte's supervisors were trained with respect to the Americans with

Disabilities Act. LaPorte does not recall seeing a poster describing his rights under the ADA at the Chicago office of Bureau Veritas.

Bureau Veritas once allowed an employee who had had hip surgery to return from FMLA leave and perform "light duty" work. Bureau Veritas asked other employees to assist that employee with carrying ladders and bags.

On April 17, 2012, LaPorte filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). He never amended the charge.

Seven months later, on November 29, 2012, LaPorte filed this suit. In response to a request for production of documents, plaintiff's attorney wrote to defense counsel, "Mr. LaPorte asserted an FMLA retaliation claim and is not currently seeking damages for interference with his rights under the FMLA."

## II.    Summary Judgment Standard

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

III.    **Discussion**

A.      **LaPorte's ADA claims**

In Count I, LaPorte claims that defendant violated the Americans with Disabilities Act by failing to provide a reasonable accommodation.  In Count II, LaPorte claims that defendant violated the ADA by discharging him due to his disability.

The Americans with Disabilities Act makes it unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Included in the definition of discrimination under the ADA is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(5)(A).

1.      **Accommodation**

In order to prevail on his failure-to-accommodate claim, plaintiff must establish that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to provide a reasonable accommodation.  *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).  The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this

subchapter, consideration shall be given to the employer's judgment as to what functions of the job are essential." 42 U.S.C. § 12111(8). With respect to the third element, the ADA requires the individual and the employer to engage in an interactive process to determine a reasonable accommodation, and the employer is liable under the ADA only if it is responsible for the breakdown in the interactive process. *Sears, Roebuck*, 417 F.3d at 797.

Plaintiff notified defendant in March 2011 that he might need an accommodation in the future. (March 10, 2011 email from LaPorte to McCombs) ("Jeff, per our discussion today, my surgeon will probable [sic] allow me to return to work the end of March, however I would be restricted to OFFICE TYPE WORK ONLY (computer, phone, report review, etc.), NO FIELD WORK which requires traveling, lifting, pushing, pulling, etc. I do not know when he will release me to conduct field work, but would think he would by the beginning or middle of May. Please let me know if BV can accommodate these restrictions, or if I need to wait until he releases me to conduct field work.").

Defendant, however, argues that it had no duty to accommodate plaintiff until much later. Specifically, defendant argues that plaintiff was not a *qualified individual* with a disability until June 27, 2011, because, before that time, plaintiff was unable to work, even with a reasonable accommodation. The Court agrees. Plaintiff explicitly told defendant on March 10 that, while he had *not* been released yet, he *expected* his doctor to release him for some work at the end of March. When the end of March came, however, plaintiff's doctor did *not* release him to work. Instead of releasing plaintiff to work, on March 21, 2011, plaintiff's doctor wrote that he would *consider* plaintiff for light duty a month later. On March 22, 2011, plaintiff wrote to his supervisor that his doctor "felt that by the end of April he would release me to conduct office

-13-

type work" and that he would not likely be available for field work until the end of June. Thus, it is undisputed that plaintiff was not a qualified individual with a disability in March 2011.

The same was true in April and May. When LaPorte returned to visit his doctor on April 25, 2011, his doctor recommended that he remain off of work another month. Likewise, on May 23, 2011, LaPorte's doctor recommended that he remain off of work another month.[2] It was not until June 20, that LaPorte's doctor released him to work with restrictions, effective June 27, 2011. Thus, the undisputed evidence shows that LaPorte was not a qualified individual (and, therefore, was not entitled to a reasonable accommodation) until at least June 27, 2011.[3] Nonetheless, the evidence reflects that Bureau Veritas granted plaintiff an extended leave of absence, which, itself, may have constituted a reasonable accommodation.

By the time plaintiff was a qualified individual with a disability, on June 27, 2011, his old position had been eliminated. The question, then, becomes whether Bureau Veritas should have transferred him to another available position. A reassignment to a vacant position can be a

---

[2]Plaintiff argues in his brief that he could have worked with restrictions earlier, but the Court only considers facts included in a statement of fact and supported by admissible evidence. The undisputed facts that plaintiff's doctor did not release him to work in April and May 2011 come straight out of Plaintiff's Statement of Undisputed Facts. (Plaintiff's Statement of Undisputed Facts ¶ 28 ("on April 25, Mr. LaPorte's doctor recommended he remain off work for another month."), ¶ 29 ("On March 23, 2011, Mr. LaPorte['s] . . . doctor recommended he not return to work for about another month.")). LaPorte testified that his doctor's medical assessments accurately reflected his medical condition from March 21, 2011 through May 23, 2011. (Def. Statement of Undisputed Facts ¶ 32).

[3]Even if plaintiff were a qualified individual with a disability earlier, his claim that defendant failed to provide a reasonable accommodation before June 22, 2011 is time barred. Plaintiff did not file a charge of discrimination until April 17, 2012, 300 days after June 22, 2011. The Seventh Circuit has concluded that a failure to accommodate is a discrete act for purposes of the statute of limitations (*Teague v. Northwestern Mem. Hosp.*, 492 Fed.Appx. 680, 684 (7th Cir. 2012)), and, while this Court does not necessarily agree, it follows the Seventh Circuit's lead.

reasonable accommodation, but plaintiff bears the burden of showing that such a position existed. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 750 (7th Cir. 2011); *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) ("[W]e must first look at whether there is a genuine issue of material fact regarding the availability of a vacant position to accommodate [plaintiff]. If there were such a position, only then do we consider whether the failure to provide that accommodation was due to the breakdown in the interactive process. It is the plaintiff's burden to show that a vacant position exists for which he was qualified.") (internal citations omitted). In this case, plaintiff has not put forth evidence from which a reasonable jury could conclude that a vacant position existed. Although the evidence shows that Bureau Veritas hired an ergonomist in Seattle on June 9, 2011, that position was filled *weeks before* plaintiff became entitled to an accommodation. Plaintiff has put forth no evidence that a vacant position was available in late June 2011.

Plaintiff has failed to put forth sufficient evidence from which a reasonable jury could conclude that Bureau Veritas is liable for failing to provide a reasonable accommodation. Defendant is entitled to judgment as a matter of law on Count I. Plaintiff's motion for summary judgment is denied as to Count I, and defendant's motion is granted as to Count I.

## 2. Disparate treatment

As noted above, when plaintiff informed defendant that he was released to return to work with restrictions, defendant informed plaintiff that his position had been eliminated due to a lack of work. Plaintiff alleges in Count II that defendant discriminated against him on the basis of his disability when it terminated his employment. Defendant has moved for summary judgment on

this claim. Plaintiff does not argue that he has direct evidence of disability discrimination. Accordingly, the Court considers his claim under the indirect method.

The indirect method follows the familiar burden-shifting approach. First, the plaintiff establishes a *prima facie* case by showing: "(1) that he is disabled under the ADA; (2) that he was meeting his employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that similarly situated employees without a disability were treated more favorably." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). If the employee makes out a *prima facie* case, then the burden (of production, not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Bunn*, 753 F.3d at 685. "Finally, if a legitimate reason is produced, the employee must prove by a preponderance of the evidence that the employer's stated reason is a lie." *Bunn*, 753 F.3d at 685.

Defendant argues that LaPorte cannot make out a *prima facie* case, because he has failed to show that similarly-situated employees without a disability were treated more favorably. The Court agrees. The undisputed evidence is that Bureau Veritas eliminated the positions of about seven employees (including LaPorte) in the Chicago office at the same time as it eliminated LaPorte's position. LaPorte has not identified any similarly-situated employees who were not disabled and who were treated more favorably. This is fatal to his claim. *Bunn*, 753 F.3d at 685 ("It is [plaintiff's] responsibility to identify a satisfactory comparator to the court, and he has not done so. When an employee cannot make out a *prima facie* case, that is the end of it; summary judgment is warranted.)

Defendant is entitled to judgment as a matter of law on Count II. Defendant's motion for summary judgment is granted as to Count II.[4]

## B. LaPorte's FMLA claim

In Count III, LaPorte alleges that he "engaged in statutorily protected activity in that he took FMLA leave from December 13, 2010 through March 7, 2011." (Complt. ¶ 67). LaPorte alleges that defendant "retaliated against [him] for taking FMLA leave." (Complt. ¶ 69). LaPorte has moved for summary judgment not only as to retaliation under the FMLA but also as to interference with his rights under the FMLA. Defendant argues that plaintiff is not entitled to summary judgment on an FMLA interference claim, because plaintiff did not plead such a claim.

Retaliation and interference are two separate claims under two separate provisions of the FMLA. An interference claim is brought under 29 U.S.C. § 2615(a)(1), which makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right under the FMLA. 29 U.S.C. § 2615(a)(1). To prevail on an interference claim, "an employee must show that: (1) [he] was eligible for FMLA protection; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to leave under the FMLA; (4) [he] provided sufficient notice of [his] intent to take FMLA leave; and (5) [his] employer denied [him] the right to FMLA benefits." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012). Sect. 2615(a)(2) prohibits "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Seventh Circuit construes § 2615(a)(2) as creating a cause of action for retaliation, and a

---

[4]Plaintiff seems to have abandoned his claim that Bureau Veritas discriminated against him by not transferring him to another position. Had he not abandoned the claim, it would have been doomed by his failure to apply for the available positions.

retaliation claim "requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson*, 690 F.3d at 825 & 828.

The Court agrees with defendant that plaintiff did not plead a claim for interference and that it is too late to add one now. Plaintiff's FMLA count is labeled as a retaliation claim, and he specifically alleges (and therefore admits) that he "took FMLA leave from December 13, 2010 through March 7, 2011." (Complt. § 67). Furthermore, during discovery, in response to a discovery request, plaintiff's counsel wrote to defense counsel, "Mr. LaPorte asserted an FMLA retaliation claim and is not currently seeking damages for interference with his rights under the FMLA." Thus, it is clear that plaintiff never plead an interference claim, and he cannot do so now. As defendant points out, a summary judgment brief is not the place to amend a complaint. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012).[5]

What plaintiff has is a claim for retaliation under the FMLA. Plaintiff alleges that he was discharged in retaliation for his having taken an FMLA leave from December 13, 2010 to March 7, 2011. In this case, LaPorte never returned to work after his FMLA leave. First, in early March 2011, LaPorte requested and was granted an extended (and, thus, unprotected by the FMLA)

---

[5]Even if plaintiff had plead an interference claim, defendant would have been entitled to summary judgment on the claim. Plaintiff's interference theory is that defendant forced him to work "constantly" during his FMLA leave, such that he did not get one. Plaintiff did not put forth evidence to support that theory. Plaintiff put forth evidence that during his FMLA leave, he emailed McCombs to let him know he would not be back in time to give a scheduled speech and to see if McCombs could find a replacement. McCombs found a replacement and asked plaintiff to provide him with the materials plaintiff had intended to present. Another time, plaintiff forwarded to Milosch an email he had received from a client. These communications constitute professional courtesy, not interference with FMLA leave. *See Reilly v. Revlon, Inc.*, 620 F. Supp.2d 524 (S.D. N.Y. 2009) ("Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights.").

leave of absence. By the end of May, Bureau Veritas had decided to terminate LaPorte's employment, effective upon his return to work. When, in late June 2011, Bureau Veritas learned that LaPorte's doctor would release him to work as of June 27, 2011, Bureau Veritas informed LaPorte that his employment was terminated due to a lack of work.

Defendant argues that it is entitled to summary judgment on plaintiff's FMLA retaliation claim, because plaintiff was unable to return to work on March 7, 2011, the end of his twelve weeks of FMLA leave. Defendant is correct that LaPorte's inability to return to work on March 7, 2011 means that he cannot prevail on a claim that Bureau Veritas *interfered* with his right to reinstatement under the FMLA. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780-81 (7th Cir. 2013) (affirming summary judgment to employer on interference claim and noting "an employer has no duty under the FMLA to return an employee to his or her positions, if that employee cannot perform an essential function of the job."); *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) ("An employee also has no right to reinstatement-and, therefore, damages-if, at the end of his twelve-week period of leave, he is either unable or unwilling to perform the essential functions of his job."); 29 C.F.R. § 825.216(c). An interference claim, however, is a separate claim from a retaliation claim. Plaintiff's claim is for retaliation.

Obviously, when an employee *returns* from an FMLA leave, an employer may not retaliate against that employee for having taken the FMLA leave. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014). LaPorte, though, was unable to return at the end of his twelve weeks of FMLA leave. The question, then, is whether the fact that plaintiff was unable to return at the end of his twelve weeks of protected FMLA leave means that his retaliation claim fails, as a matter of law. Some courts have answered yes to that question. *See*

*Gomez v. Dynamic Mfg., Inc.*, Case No. 12-cv-7396, 2013 WL 3270660 at *2 (N.D. Ill. June 27, 2013) (holding that plaintiff, who could not return to work at the end of twelve-week FMLA leave, could not state claims for interference or retaliation); *Pontolillo v. St. Vincent Health, Inc.*, Case No. 06-cv-1509, 2009 WL 276784 at *12 (S.D. Ind. Feb. 4, 2009) (fact that plaintiff could not return at the end of twelve weeks of FMLA leave lead court to "the inescapable conclusion" that "[plaintiff's] retaliation claim fails.").

These cases are consistent with the Seventh Circuit's statement in *Breneisen v. Motorola, Inc.*, 656 F.3d 701 (7th Cir. 2011) that "[w]hen serious medical issues render an employee unable to work for longer than the twelve-week period contemplated under the statute, the FMLA no longer applies." *Breneisen*, 656 F.3d at 705 (affirming judgment to defendant on an FMLA retaliation claim). The facts of *Breneisen*, of course, are distinguishable from this case. In *Breneisen*, the plaintiff did not allege that he had been discharged in retaliation for having taken twelve weeks of FMLA leave. *Id.* at 794 ("Nor does Breneisen allege that he was wrongfully terminated in retaliation for taking FMLA leave."). Instead, Breneisen alleged that defendant retaliated against him by harassing him. Breneisen had taken an FMLA leave, returned to work and then taken a subsequent leave that was not protected by the FMLA. When Breneisen returned from his second (unprotected) leave, defendant allegedly harassed him so much that his injury was exacerbated and he became unable to work. The Seventh Circuit said that "the cause of an injury is irrelevant under the FMLA" and that "exacerbation is not a valid theory of liability under the FMLA." *Id.* at 705. The Seventh Circuit also said, "Since the retaliatory conduct which Breneisen alleges occurred happened when he was no longer subject to the FMLA's clearly defined protections, he is not entitled to recovery for an FMLA violation." At first, that

statement (which would seem to preclude LaPorte's retaliation claim) sounds like dicta. But the Seventh Circuit went on to say, "When serious medical issues render an employee unable to work for longer than the twelve-week period contemplated under the statute, the FMLA no longer applies. That is true regardless of the cause of the infirmity." *Id.* at 705. That leads the Court to conclude that the Seventh Circuit held that an employee who could not work after exhausting his twelve weeks of FMLA leave could not claim retaliation. In addition, this Court does not see how one who was unable to return to work after twelve weeks of leave could be thought to have "oppos[ed] any practice made unlawful by" the FMLA, which is the basis of a retaliation claim. For these reasons, the Court concludes that plaintiff's retaliation claim fails as a matter of law.

In any case, plaintiff has not put forth sufficient evidence of retaliation using the direct method, as he appears to be trying to do. To do so, he must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014). A plaintiff can show a causal connection either with a direct admission or a "convincing mosaic" of circumstantial evidence, such as "suspicious timing, ambiguous statements from which retaliatory intent can be inferred, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Langenbach*, 761 F.3d at 800.

Here, there is no convincing mosaic of circumstantial evidence showing an intent to retaliate against LaPorte for having taken an FMLA leave. As defendant points out, it did not discharge him at the end of his twelve weeks of leave. Instead, defendant gave LaPorte

additional leave time (including medical benefits and income replacement under a policy Bureau Veritas had paid for) to get well. It was not until late May 2011, about ten weeks after LaPorte's FMLA leave ended, that defendant decided to terminate the employment of LaPorte and six other employees in the Chicago office, because business was slow. It is undisputed that work from two of LaPorte's big clients–Carefusion and Cardinal Health–was greatly diminished. Although another region was hiring an ergonomist at about the same time that the Chicago office was deciding to terminate LaPorte's employment, that does not suggest that the Chicago office had enough work to support LaPorte's salary. Finally, although Bureau Veritas employees expressed frustration with the length of LaPorte's leave, the frustration was expressed not *during* LaPorte's FMLA leave but *after* his FMLA leave was over, when LaPorte was on a leave of absence that Bureau Veritas was not legally obligated to give him. The comments do not suggest an intent to punish LaPorte for having taken an *FMLA* leave.

Defendant's motion for summary judgment is granted as to Count III.

### C.    LaPorte's ADEA claim

Finally, in Count IV, LaPorte claims that defendant discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act. The Age Discrimination in Employment Act makes it "unlawful for an employer–(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1). To show age discrimination under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination, which consists of evidence that: (1) he is a member of a protected class; (2) his job performance met his

employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) a similarly-situated individual outside of his protected class was treated more favorably than he was treated. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires a plaintiff to show that he was "rejected under circumstances which give rise to an inference of unlawful discrimination," and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6.

LaPorte alleged in his complaint that defendant discriminated against him when it failed to offer him the opportunity to transfer to a different office, "[u]nlike substantially younger employees, who were offered the opportunity to transfer to a different office." (Complt. § 78). Defendant moves for summary judgment on this claim. Defendant points out that when it eliminated LaPorte's position, it also eliminated six other positions in the Chicago office. Only one employee (Jurkowski) whose position was eliminated transferred to another office. Defendant argues that Jurkowski is not similarly situated to LaPorte, because Jurkowski, unlike plaintiff, applied for a position outside of her region. LaPorte did not. Defendant also argues that Jurkowski, like plaintiff, is over the age of 40 and not so much younger than LaPorte as to create an inference of discrimination.

In response, LaPorte abandons his claim that defendant discriminated against him by not transferring him. Instead, LaPorte argues that he was discriminated against in that defendant reassigned his duties to individuals substantially younger than he was when they eliminated his position. Plaintiff has not, however, put forth sufficient evidence from which a reasonable jury

-23-

could conclude that his duties were reassigned to substantially younger employees. First, the only evidence in the record about the reassignment of LaPorte's duties is evidence that LaPorte's bill-reviewing work was reassigned to two support staffers (Mary Starke, age 64; and Arlene Basten, age 60), both of whom were older than LaPorte. LaPorte has put forth no evidence that his other duties were reassigned to substantially younger workers. Although, it is undisputed that other regions of Bureau Veritas hired ergonomists in the months leading up to LaPorte's discharge (Rhonda Mollura (age 42) was hired for a position in Santa Clara, California in April 2011, Will Mann (age 65) was hired for a position in Seattle, Washington in May 2011 and Steve Jones (age 44) was hired for a position in Seattle, Washington in June 2011), LaPorte has put forth no evidence that his duties were reassigned to any of these new employees. To the contrary, the undisputed evidence is that by the end of May 2011, Bureau Veritas's work for Cardinal Health and Carefusion (two of the clients LaPorte performed work for) had substantially diminished. Because plaintiff has not put forth evidence that his duties were reassigned to substantially younger employees when his position was eliminated, he has not made out a *prima facie* case of age discrimination.

Defendant is entitled to judgment as a matter of law on plaintiff's age discrimination claim. Accordingly, defendant's motion for summary judgment is granted as to Count IV.

**IV.  <u>Conclusion</u>**

For the reasons set forth above, the Court denies plaintiff's motion for summary judgment. The Court grants defendant's motion for summary judgment. The Court grants defendant summary judgment on Counts I, II, III and IV. Case closed.

.

ENTER:

George M. Marovich
George M. Marovich
United States District Judge

DATED:  January 30, 2015